Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
lauranielson@ericnielson.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| DANA M. and L.M., <br><br> Plaintiffs, <br><br> vs. <br><br> AT&T, INC. and the AT&T UMBRELLA BENEFIT PLAN NO. 3, <br><br> Defendants. | **COMPLAINT** <br><br> Case No. 1:23-cv-00026-DBP <br><br> Judge <br><br> Magistrate Judge Dustin B. Pead |

**COME NOW** Dana M. and L.M., collectively, individually, and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Dana M. ("Dana") is a natural person residing in Jefferson County, Missouri. She is covered by a self-funded plan, the AT&T Umbrella Benefit Plan No. 3 ("the Plan"), provided through Dana's employer, AT&T Inc. ("AT&T"), who is also the plan administrator and sponsor.

2. Plaintiff L.M. is a resident of Jefferson County, MO. As a beneficiary of his mother's health insurance plan, he received treatment at Crossroads Academy ("Crossroads"), a

1

licensed residential treatment facility in Ogden, Utah from January 31, 2019 through October 10, 2019.

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the treatment took place in the State of Utah and the appeals were written by a company located in Salt Lake City, Utah.

5. Plaintiffs seek payment of L.M.'s denied claims from January 31, 2019 through October 10, 2019 for treatment rendered at Crossroads, pursuant to 29 U.S.C. §1132(a)(1)(B).

6. Plaintiffs seek injunctive relief pursuant to 29 U.S.C. §1132(a)(3) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

7. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

8. L.M. began using illicit substances in 8th grade, which was around the same time his behavioral and anxiety issues began.

9. Since 8th grade, L.M. has exhibited reckless, dysregulated, and frequently oppositional behavior. He struggled with sleep, irritability, anxiety, and school performance.

10. L.M. threatened suicide multiple times and has a histoy of self-harming via cutting from 2017 through 2018.

11. In April of 2017, L.M. and his father got into a physical altercation and L.M. kicked his father hard enough in the face that his father needed surgery to correct fracture damage. L.M. was removed from the home and sent to a juvenile detention facility.

12. On December 8, 2018, L.M. was hospitalized through Mercy Hospital and officially diagnosed with Bipolar Disorder. This hospitalization was his third psychiatric hospitalization.

13. While he was hospitalized, L.M. displayed psychotic symptoms, including delusions. L.M.'s doctor felt he was a flight risk and referred L.M. to ViewPoint Center ("ViewPoint") in Utah.

14. While at ViewPoint, L.M.'s psychotic symptoms increased and he was tried on anti-psyhotic meds. His treatment team recommended residential treatment as the level of care for L.M. to continue working on his behavioral issues.

15. On January 31, 2019, L.M. was transitioned from ViewPoint to Crossroads.

**PRE-LITIGATION PROCESS FOR L.M.'S TREATMENT AT CROSSROADS**

16. Claims were submitted to the Plan by the Plaintiffs for L.M.'s treatment at Crossroads.

17. On February 4, 2019, Beacon, the mental health claims administrator for the Plan, sent a letter denying L.M.'s treatment at Crossroads. The denial letter stated, in part:

> You are a 17-year-old male who was admitted to dual diagnosis long term residential mental health treatment on 01/31/2019, after 50 days in a short term residential program. Your symptoms had included depression and physical aggression toward your family. You had also been using substances including alcohol, marijuana, opiates, Adderall, Xanax, and LSD. While in the short term program, you were treated with group, individual, and family therapies, as well as medication management. You have been treated with Seroquel and Lexapro. Your mood and behaviors have shown some improvements. Therefore, as of 01/31/2019, per your treatment team, you require treatment in a long term residential mental health treatment program, which is not an insuranve-covered benefit.

18. On July 22, 2019, the family submitted a Level One Member Appeal.

19. In the appeal, Plaintiffs outlined that they had certain rights under ERISA, such as (1) a full, fair, and thorough review; (2) all comments, documents, records, and other information

relating to their claim; (3) the identification and credentials of any medical or vocational expert whose advised was obtained in connection with their claim (even if their advice was not relied upon in making the adverse decision); and (4) a description of any additional material or information necessary for the family to perfect their claim along with an explanation of why such information is necessary. She advised Beacon that is was imperative they complied with ERISA regulations.

20. The family also outlined that they disagreed with Beacon's rationale that long term residential treatment wasn't covered under their Plan.

21. The family quoted the Summary Plan Description ("SPD") for their Plan to further support that L.M.'s treatment was covered by the Plan. The SPD states, in part:

> Mental Health Services and Substance Use Disorder Services received in an inpatient or intermediate care basis in a Hospital or Alternative Facility are covered. Benefits include detoxification from abusive chemicals or substances that is limited to physical detoxification when necessary to protect your physical health and well-being.
>
> The Mental Health/Substance Use Disorder designee, who will authorize the Services, will determine the appropriate setting for treatment. If an inpatient stay is required, it is covered on a Semi-private Room basis.

22. The family stated that Crossroads is an intermediate care provider and meets the Plan's definition of Alternative Facility, which states, in part:

> A health care facility, such as a freestanding facility or ambulatory surgery center, that is not a Hospital and that provides Covered Health Services on an outpatient basis, as permitted by law. The facility must be duly licensed by the appropriate state and local authority to provide such Services.

23. Plaintiffs advise that Crossroads is duly licensed by the State of Utah to provide residential treatment to adolescents ages 14 to 17 years old. To maintain their license, Crossroads must comply with all the rules and regulations that govern residential treatment centers in the State of Utah.

24. Plaintiffs quoted a letter from Dr. Michael S. Connolly pointing out the flaws in attempting to limit residential treatment services to "short term" lengths of stays. Dr. Connolly advises that the average length of stay in a residential treatment center is seven to ten months.

25. Plaintiffs further outlined that L.M.'s treatment at Crossroads is an analogous level of care to their intermediate medical health benefits, such as skilled nursing facility services or rehabiliatative services.

26. The family also outlined that Beacon was not applying a similar treatment limitation to mental health and substance use disorder benefits as they were to medical health benefits by denying L.M.'s claims due to an arbitrary time limit from one of Beacon's reviewers that does not appear in the governing plan documents.

27. The family went on to outline that Beacon was not applying a similar treatment limitation to mental health and substance use disorder benefits as they were to medical health benefits by denying L.M.'s claims due to restrictions that did not appear to apply to medical or surgical benefits at the same level, creating a nonquantitative treatment limitation ("NQTL"). Specifically, Plaintiffs outlined that Beacon may be imposing a NQTL based on requiring mental health and substance use disorder patients to exhibit acute symptoms to qualify for treatment but not requiring the same of medical or surgical patients.

28. Plaintiffs concluded by requesting that Beacon take all this information into account when reviewing the appeal. Plaintiffs also asked that, in the case of an adverse benefit determination, Beacon provide them a copy of all the documents under which the Plan is operated, the clinical guidelines or medical necessity guidelines utilized, and requested the mental health and substance used disorder medical necessity guidelines as well as the analogous medical and surgical medical necessity guidelines.

29. In a letter dated August 16, 2019, Beacon upheld their denial. The denial letter stated, in part:

> You are a 17-year-old male who was admitted to residential mental health treatment on 01/31/2019, due to exhibiting behavioral outbursts towards others and substance use. Evidence shows that you just completed treatment in a short term residential program and were taking your medications as prescribed. You had a supportive family and was [sic] motivated for treatment. You did not have any behavioral or mental health conerns that require 24 hour a day support. Therefore, as of 01/31/2019, it was not medically necessary to manage your symptoms with residential mental health treatment. Your care could have been safely addressed with intensive outpatient mental health treatment, which typically meets several days a week, and several hours a day.
>
> This decision is based on Beacon Health Options Medical Necessity Criteria 2.202.04, for Residential Treatment Services (RTS) (see enclosure) and the terms of your plan as outlined in the Summary Plan Description. The Summary Plan Description is provided by your employer.

30. The family submitted a Level Two Member Appeal on January 31, 2020.

31. The family outlined in the appeal that, once again, Beacon was in violation of their fiduciary duties under ERISA. The family stated that they had certain rights under ERISA, such as (1) a full, fair, and thorough review; (2) all comments, documents, records, and other information relating to their claim; (3) the specific reasons for the adverse determination including any specific plan provisions, medical criteria, and other documents utilized in making said determination; (4) the identification and credentials of any medical or vocational expert whose advised was obtained in connection with their claim (even if their advice was not relied upon in making the adverse decision); (5) a description of any additional material or information necessary for the family to perfect their claim along with an explanation of why such information is necessary.

32. The family states that Beacon was violating generally accepted standards by requiring L.M. to exhibit acute symptoms to receive sub-acute/intermediate treatment.

33. The family reiterated that Beacon was applying a NQTL to L.M.'s treatment and was in violation of the Parity Act.

34. Dana once again outlined L.M.'s medical necessity documentation and proof that his treatment was medically necessary and should be covered by Beacon.

35. In a letter dated March 5, 2020, Beacon upheld their denial and issued a final adverse determination, stating, in part (bold emphasis in original):

> Based upon the information provided, the Beacon doctor has decided that the treatment requested for **residential mental health treatment from 01/31/2019 to 10/10/19, cannot be certified.**
>
> …You are an 18-year-old male for whom admission was requested to residential mental health treatment on 01/31/2019, due to symptoms of depression and anxiety. Based on the provided information, you just completed residential substance use treatment at a program. You were feeling anxious. Your thoughts were clear and you were not exhibiting any behavioral concerns that required 24 hour a [sic] support. You were taking your medications as prescribed. Therefore, as of 01/31/2019, it was not medically necessary to manage your symptoms with residential mental health treatment.

36. The family exhausted their appeal rights with Beacon.

## FIRST CAUSES OF ACTION

**(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B)) and Claim for Equitable Relief Pursuant to 29 U.S.C. §1132(a))**

37. ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits. 29 U.S.C. §1104(a)(1).

38. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1104(a)(1)(D) and §1133(2).

39. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for L.M.'s claim denial, written in a manner calculated to be understood by the family; 2) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the L.M.'s claim; 3) by developing and relying upon internal practices and policies that improperly restricted coverage in contravention of Plaintiffs' health insurance plans, ERISA, and the Parity Act; and 4) by failing to discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.

## SECOND CAUSE OF ACTION

### (Claim for Violation of the Parity Act Under 29 U.S.C. §1132(a)(3))

40. The Parity Act is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and the Parity Act.

41. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

42. The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

43. Impermissible nonquantitative treatment limitations under the Parity Act include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

44. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan restricted for L.M.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does the Plan restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner the Plan restricted coverage of treatment for L.M. at Crossroads.

45. Specifically, the Plan's reviewers utilized internal processes and procedures that may have placed a limitation on the scope of services available for intermediate behavioral health care, while not limiting the scope of services available for intermediate medical or surgical benefits.

46. When the Plan receives claims for intermediate-level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. The Plan evaluated L.M.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of

medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

47. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

48. The violations of the Parity Act by the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

49. A declaration that the actions of the Defendants violate the Parity Act;

50. An injunction ordering the Defendants to cease violating the Parity Act and requiring compliance with the statute;

51. An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with the Parity Act;

52. An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of the Parity Act;

53. An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of the Parity Act;

54. An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

55. An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of the Parity Act; and

56. An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of the Parity Act.

57. 45. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A.

58. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

## RELIEF

59. WHEREFORE, the Plaintiffs seek relief as follows:

60. Judgment in the total amount that is owed for L.M.'s medically necessary treatment at Crossroads under the terms of the Plan, plus pre- and post-judgment interest to the date of payment;

61. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

62. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

63. For such further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 3rd day of March, 2023.

G. ERIC NIELSON & ASSOCIATES

*/s/ Laura Nielson*
Laura Nielson
*Attorney for Plaintiffs*